### STATE v. WAYLAND LEE.

(Filed 25 February, 1914.)

**1. Evidence — Expression of Opinion — Inferences — Questions for Jury—Argument 'of Counsel—Appeal and Error.**

It is for the jury to draw reasonable inferences from the evidence, and counsel may argue to them the inferences to be drawn; and while the court may instruct the jury that there is no direct evidence of the conclusion argued, it is reversible error to charge them to pay no attention to the argument, as such is an expression of opinion forbidden by statute, and deprives the client of the benefit of his attorney's services therein.

**2. Criminal Law—Evidence—Inference—Malice.**

Upon this trial for highway robbery alleged to have been committed at the point of a pistol as the prosecutor was on his way to church in a country community, at a place comparatively thickly settled, evidence that the defendant did not have a pistol; that shortly after the time of the offense charged the prisoner went into the meeting and afterwards left with a young woman, to whom he was engaged, living in the same neighborhood with the prosecutor, and whom the prosecutor knew, was, under the further circumstances of the case, sufficient upon which to base the inference and argument that the prosecutor had been influenced through jealousy and malice in swearing out the indictment.

3. **Constitutional Law — Courts—Courtesy to Counsel—Prejudicial Remarks—Appeal and Error.**

Where an attorney has argued to the jury a reasonable inference to be drawn from the evidence in favor of his client, it is reversible error for the judge, in his charge, to mention the inference as a statement of fact testified to by the attorney, saying that he was the only one who had so testified, as such statement could not be termed testimony, and prejudiced the prisoner's defense in the minds of the jury. The Court expresses its disapprobation of such language used by the judge (Const., Art. IV, sec. 8), and points out the fact that attorneys are entitled to courteous treatment.

4. **Criminal Law—Sentences—Court's Discretion—Excessive Punishment.**

*Semble*, under the evidence in this case the punishment for highway robbery was excessive, but not held as a matter of law to have exceeded the authority of the judge to impose. The intent of the Legislature in imposing a maximum and minimum punishment, leaving the extent otherwise in the discretion of the court, discussed by CLARK, C. J.

APPEAL by defendant from *Peebles, J.*, at September Term, 1913, of BERTIE.

The defendant was convicted of highway robbery. He is a one-armed negro boy 19 years of age. Frank Gilliam, the prosecutor, also colored, testified that he was 17 years of age; that he never had any fuss with the defendant; that in June previous he was going along the public road to preaching at the schoolhouse; that when he passed James Bazemore's gate he saw William Taylor at the gate; that this was about 8 o'clock at night; that he passed Taylor without speaking and went about 60 yards farther along the public road, when he saw the defendant standing near a cedar tree; that as he passed the defendant the latter said he was going to kill him, and, following him, repeated the remark several times; that he turned around and asked him his name; that he had a pistol in his hand, not pointing at the witness, but down at his side, and he said: "If you don't give me your money, I am going to kill you"; that he gave him 11 cents that he had in his pocket, two nickels and a penny; the defendant had put the pistol in his pocket before the witness gave him the money; that he gave him the money because he was afraid

he would take the pistol out and shoot him; the witness says he then went on to church at the schoolhouse; that he was there but a few moments before the defendant came in; the defendant sat in the house about five minutes, and then went out and sat at the door, where there was a large crowd; the witness says he did not get out a warrant till the Wednesday following; that Bazemore lives near the road, and so does Mizzell; that where he was robbed was the open road; there were some weeds on one side of the road as high as your head. The State rested.

The defendant testified that he lost his arm six years ago, and can only drive a wagon, which is his work; that he did not see Gilliam, the prosecuting witness, along the road; did not have a pistol, does not own one; did not hold Gilliam up nor rob him and did not see him that night except at the schoolhouse; that he heard nothing about this charge until the following Saturday.

Matthew Bass and Gatling Freeman testified that they had worked in the woods with the defendant for a year, and that he did not have a pistol, and that they never saw him with a pistol at any time. Henry Bass testified to the same effect. David Outlaw testified that the defendant boarded at his house for a month, and did not have a pistol. J. J. Alston testified that he had known the defendant for years, and that his general character was good.

Bettie Gilliam testified that the defendant came to preaching soon after she got there with her father; that he went home with her; that he did not have a pistol, and never saw him with one. She further testified that she and the defendant are engaged to be married, and that she knows Frank Gilliam.

George Gilliam testified that he saw the defendant that night; that he has known him for years and never saw him with a pistol. Mary Gilliam testified to the same effect.

James Bazemore testified that he knows the defendant; that when he was going home he met him about 6 or 7 o'clock in company with William Taylor, at his gate; that they wanted to buy a watermelon, and he sold it, but they could not pay him because he could not change a $10 bill for the defendant; that he lives

about 75 yards from the road and about 300 yards from the schoolhouse where the preaching took place that night; that Mizzell lives across the road from him; that Ward lives down the road about 200 yards; that the next house is about a quarter of a mile, and several other houses are along the road for about a mile. The defendant closed.

In his address to the jury defendant's counsel was contending that the whole situation negatived the contention of the State, and that the prosecutor, Frank Gilliam, must have been animated by some bad motive and should not be believed. He said: "What is that motive? You have heard the solicitor ask Bettie Gilliam if she and defendant were not engaged. She said they were. That question was doubtless prompted by the prosecutor who sits by the solicitor. Why is Frank Gilliam concerning himself about whom the defendant is engaged to? Does that account for his malice, if he has any? Is he concerned about Bettie Gilliam's engagement?" Counsel also insinuated that if the truth were known, the fact that Wayland Lee had captured Bettie has inspired this indictment by the prosecuting witness. The solicitor did not object to this line of argument, and in his reply referred at length to this insinuation of the defendant's counsel, saying that there was no evidence to support it, and that not a witness had ever testified that Frank Gilliam had ever spoken to Bettie Gilliam.

The court in charging the jury, among other things, said: "The defendant contends that Frank Gilliam is animated by malice and hatred of the defendant because the defendant has become engaged to Bettie Gilliam, and that he was in love with her himself. I charge you that there was no evidence of this. No witness has sworn to it or testified to it except Mr. Winston, and he was not sworn, and you must not pay any attention to anything that he has said about this." To this the defendant excepted. Verdict of guilty; judgment, and appeal.

*Attorney-General T. W. Bickett and Assistant Attorney-General T. H. Calvert for the State.*

*Winston & Matthews for defendant.*

CLARK, C. J. The evidence for the State was in many aspects very improbable, and the defendant's counsel was justified in arguing to the jury that they should infer that the prosecution was based upon some bad motive. Considering that both the prosecuting witness and the defendant were young, and that the latter was engaged to Bettie Gilliam, counsel might reasonably argue that jealousy was the motive, and contend that the jury should draw that inference. The presiding judge was within his province when he told the jury that there was no evidence to that effect. But he erred when he told the jury that they should disregard the argument of counsel because no one but the counsel had testified to this state of facts, that he was not sworn, and that the jury should not pay any attention to anything that he had said about this.

It is the province of the jury to draw inferences from the facts in evidence and for counsel to argue what inferences they should draw. The court can tell the jury that there is no evidence on any point, but it is not in his province to tell the jury that they should not accept or pay any attention to any inference which the counsel has urged them to draw from the facts in evidence. This is to express an opinion, which is forbidden by statute. It was a very clear intimation to the jury that they should find the defendant guilty.

To illustrate our meaning: A morning paper has this paragraph: "A man in Sioux City placed in his stove, among other kindling, a stick of dynamite. The silver-plated handles cost $10." There was no statement of a catastrophe or a funeral, but an inference could be drawn. In this case the evidence, exclusive of the denial of the defendant, was that the robbery took place along a public road about 300 yards from the preaching to which people were going, in 60 yards of another man, near to two houses, and in the vicinity of several others; that both the prosecutor and the defendant went immediately to the preaching, where the latter showed himself and sat with and mingled with the crowd of people; that no complaint was made for some days and no outcry at the time; both parties were under 21, and the defendant was engaged to be married to a

STATE *v.* LEE.

girl whom the prosecutor knew. Upon these facts the distinguished counsel for the defendant was arguing that the evidence of the prosecution was improbable, and that there was a bad motive, and intimated that it might be jealousy. To tell the jury to disregard and "pay no attention" to this argument of the defense was to deprive him practically of the right to be heard by counsel, and was a strong intimation by the court that they ought not to believe such defense. In difficult cases Vidocq, the famous French detective, always told his agents, *"Cherchez la femme"*—that is, "Look for the woman." The defendant's counsel was asking the jury to apply this principle, and was fully within his rights in doing so.

Besides this, the remark of the court that counsel had "testified when he was not sworn" was a reflection upon the counsel. It was doubtless not so intended by his Honor, but under the supervisory authority given this Court "over the proceedings of the inferior courts" (Const., Art. IV, sec. 8) we must express our disapprobation of the words used. The relation between courts and counsel should always be courteous. Should counsel forget their duty in this respect, the presiding judge has authority to enforce respect by proceedings in contempt. Judges should therefore be careful to observe the respect which is due from them to counsel, for when this is not done there is not only no remedy except by appeal to this Court, but the cause which the counsel is advocating may be seriously damaged in the estimation of the jury, as was very probably the case in this instance.

It was incorrect to state that counsel had "testified," for he had not made, according to the record as sent up by the judge, any statement of fact, but had distinctly urged jealousy upon the jury as an inference from the evidence and the attendant circumstances merely as he had a right to do. Even if counsel had stated this as a fact, he certainly had not "testified" to it, because he had not been sworn as a witness in the cause, as the jury well knew.

This Court has always enforced the rule that witnesses must not be treated with indignity or discourtesy by court or counsel, and counsel certainly are entitled to be treated with equal consid-

eration. They are not only entitled to this on their own account, but because derogatory remarks from the Bench towards counsel are calculated to injuriously affect the client and the cause which the counsel represents. From the evidence sent up in this case it is reasonable to suppose that the remark of the judge to the counsel and his direction to the jury not to "pay any attention to anything that he has said about this," had a prejudicial effect upon the verdict. It is reasonable also to presume that the judge did not so intend, nor thought that he was reflecting upon counsel. But the result would be the same.

The defendant further excepts because a sentence of nine years and six months on the county roads upon a conviction on this state of facts was "cruel and unusual punishment." It is contended for the State that this being a felony, the punishment for which is fixed by statute at imprisonment "in the county jail or State's Prison not less than four months nor more than ten years," that this is a power conferred by legislative authority upon the trial court, and that this Court cannot hold unlawful a punishment which the statute has authorized. In *S. v. Rippy,* 127 N. C., 517, it is said: "The quantum of punishment, whenever mentioned in The Code, is either 'in the discretion of the court' or 'not exceeding.'" As to punishments that are in the discretion of the court, it is said in *S. v. Driver,* 78 N. C., at p. 429: "There is a limit to the power of the judge to punish, even when it is expressly left to his discretion. What the precise limit is cannot be prescribed. The Constitution does not fix it, precedents do not fix it, and we cannot fix it, and it ought not to be fixed. It ought to be left to the judge who inflicts it under the circumstances of each case, and it ought not to be abused, and had not been abused (grossly) in a century, and probably will not be in a century to come; and it ought not to be interfered with except in a case like the present, where the abuse is palpable." This was said in a case where the sentence was for an assault and battery, as to which the punishment is "in the discretion of the court."

Whether this Court could hold as a matter of law that the judge has exceeded his power in imposing a sentence within the limit prescribed by the statute is a different matter. As we have

given a new trial for the errors above stated, we will not now discuss or consider this proposition, as to which it is unnecessary that we intimate any opinion.

While we will not hold, therefore, that as a matter of law the punishment was in excess of the powers of the judge, we are frank to say that it does not commend itself to us as being at all commensurate with the offense, even if the defendant was properly found guilty upon the facts. There were neither aggravation nor circumstances which tended to show that the punishment should approximate the highest limit allowed by the law in such cases. It was evidently intended that where there was no aggravation that the punishment should approximate the lower limit allowed, and only when aggravation was shown should the highest degree of punishment authorized by the statute be inflicted.

For the errors above stated the judgment must be set aside, and we order a

New trial.