STATE OF NORTH CAROLINA v. ELMORE LYNCH, JR.

No. 42

(Filed 10 June 1971)

1. **Criminal Law §§ 99, 162— conduct of trial court — failure to rule on objections — prejudicial error**

Trial judge prejudiced the defendant's case when he instructed the court reporter to put an "overruled" after every objection made by defense counsel and when he thereafter failed to rule on 38 objections made by defense counsel.

2. **Constitutional Law §§ 30, 32— right to counsel — right to impartial trial**

Every person charged with crime has the right to the assistance of counsel at a trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm.

3. **Attorney and Client § 5— attorney's duty to represent client — making of objections**

It is a lawyer's duty to represent his client, even though his objections and exceptions may frequently harass the judge.

4. **Criminal Law § 99— conduct of trial — expression of opinion on the evidence**

Under our law a judge is forbidden to express an opinion upon the credibility of the evidence.

5. **Criminal Law § 75— admissibility of a minor's confession**

A confession is not inadmissible merely because the person making it is a minor.

State v. Lynch

6. **Constitutional Law § 32; Criminal Law § 75— rights of minors — waiver of counsel — confession**

A minor who has arrived at the age of accountability for crime may waive counsel in the manner provided by law and may make a voluntary confession without the presence of either counsel or an adult member of his family provided he fully understands his constitutional rights and the meaning and consequences of his statement.

7. **Criminal Law § 76— in-custody confession by minor — determination of admissibility**

In determining whether a minor's in-custody confession was voluntarily and understandingly made, the judge will consider not only his age but his intelligence, education, experience, the fact that he was in custody, and any other factor bearing upon the question.

8. **Constitutional Law § 32— right to counsel — indigent defendant — in-custody interrogation — waiver of counsel**

An indigent charged with a felony is entitled to the services of counsel at an in-custody interrogation, and the indigent can waive this right only in writing. G.S. 7A-451; G.S. 7A-457.

9. **Criminal Law § 76— admission of confession — findings of fact**

Where there was no conflicting evidence on *voir dire*, the trial judge could admit a confession without making specific findings of fact.

10. **Criminal Law § 75— narrative statement by indigent defendant — absence of counsel — admissibility**

An indigent defendant's narrative statement that was not the result of an in-custody interrogation is admissible in evidence even though the statement was given in the absence of counsel.

11. **Criminal Law § 75— inadmissibility of confession — absence of counsel at interrogation — indigent defendant**

Defendant's statements during an in-custody interrogation in the absence of counsel are inadmissible if, at the time of the interrogation, the defendant was indigent and had not signed a written waiver of counsel. G.S. 7A, Art. 36.

12. **Criminal Law §§ 70, 74, 75— admissibility of tape-recorded confession**

A tape-recorded confession, like any other form of confession, is substantive evidence and is admissible in evidence if the confession is voluntary and otherwise lawful.

13. **Criminal Law § 76— tape-recorded statements — determination of admissibility**

Upon objection to the introduction of defendant's tape-recorded statements made during an in-custody interrogation, the trial judge must conduct a *voir dire* and listen to the recording in the absence of the jury in order to determine if the recording meets the applicable standards.

---

State v. Lynch

---

14. **Criminal Law § 169— testimony that defendant was member of Black Panthers — prejudicial error**

In a prosecution charging defendant with arson, testimony that defendant was a member of the Black Panther organization was prejudicial to defendant.

15. **Criminal Law § 169— arson case — prejudicial error in admission of evidence**

In a prosecution charging defendant with the felony of arson, the trial court erred in (1) admitting defendant's in-custody statements without making a factual determination whether defendant was indigent and properly waived right to counsel and (2) admitting defendant's tape-recorded statements without determining whether the tape-recording complied with applicable standards.

Justice LAKE concurs in result.

APPEAL by defendant under G.S. 7A-30(2) from the decision of the Court of Appeals reported in 9 N.C. App. 71, 175 S.E. 2d 327. This appeal was docketed and argued at the Fall Term as case No. 40.

At the 2 March 1970 Session of GASTON, before *Falls, J.,* defendant was tried upon an indictment which charged that on 10 August 1969 he did wilfully and feloniously attempt to burn the dwelling house of Marshall J. Welch and wife, located south of Stanley, North Carolina, on N. C. Highway No. 275, a violation of G.S. 14-67.

The first charge made against defendant with reference to the burning of the Welch residence was a charge of arson contained in a warrant issued by the District Court of Gaston County on 20 September 1969. Defendant was bound over to the Superior Court upon his preliminary hearing on 16 October 1969. At that hearing defendant was represented by his privately employed counsel. At the 3 November 1969 Session, and again at the 9 February 1970 Session, the grand jury returned a bill of indictment which purported to charge defendant with the common-law crime of arson as alleged in the warrant. Each bill, however, failed to charge one of the essential elements of that capital crime. At the 2 March 1970 Session the grand jury returned the bill charging a violation of G.S. 14-67, upon which defendant was tried. At the trial he was represented by his present attorney, Robert Powell, Esquire, who was appointed to represent him on 24 November 1969, the day he executed an affidavit of indigency.

State v. Lynch

Evidence for the State tended to show: The Welch residence, situated on the Dallas-Stanley Highway in Gaston County, was set on fire about 9:30 p.m. on Sunday, 10 August 1969, when a gasoline bomb, made from a quart size Coca-Cola bottle, was thrown on the front porch. Before the fire was extinguished it had charred the asbestos siding and the window casings to the right of the front door, melted the aluminum window screens, scorched the concrete porch and surrounding ground upon which gasoline had spilled.

Upon the intimation of a State's witness that defendant had made a statement to the investigating officers, the judge immediately excused the jury and conducted a *voir dire*. Upon this inquiry the testimony of Officers Auten and Hovis tended to establish the following facts:

On 19 September 1969 defendant was arrested upon a charge that on 27 June 1969, in violation of G.S. 14-62, he had wantonly and wilfully burned the *barn* of Marshall Welch, located on Highway No. 275 in Gaston County. Defendant was arrested on this charge and taken into custody. He was then fully and properly advised of his constitutional rights. He was not questioned at that time, however, and he made no statement.

On the following day the warrant was issued charging defendant with arson in connection with the burning of the Welch *residence*. About 3:00 p.m. on that day defendant told the jailer that he wanted to see Detective Hovis. In compliance with this request defendant was taken to the sheriff's office about 5:00 p.m. There he informed Officers Hovis, Holmsley, and Auten that he wanted to make a statement. At that time no officer had questioned defendant, and before he was allowed to say anything further Captain Auten told him that he was charged with arson, a crime punishable by death, and that he might go to the gas chamber if he confessed. Notwithstanding, defendant insisted he wanted to tell the truth about the burnings and "get it over with." No threats or promises of any kind were made to him, and he was not under the influence of alcohol or drugs. Because of the seriousness of the crime with which he was charged Auten attempted to locate defendant's mother. Although his efforts were not immediately successful defendant's mother did come to the jail later that night.

Notwithstanding the fact that Hovis had advised defendant of his constitutional rights earlier, Auten again told him that he didn't have to make any statements; that he could have an attorney present when he talked to the officers if he desired one; that if he couldn't afford an attorney the court would appoint one for him; that anything he told the officers could be used against him; that he could answer their questions "to any degree that he desired and he could stop answering questions at any point he desired." Defendant said that he did not want to talk to an attorney. However, he was not asked to sign any waiver of counsel or any other statement, and he did not do so. Auten asked defendant several times if he understood his rights, and each time he said he did. After Auten was "thoroughly convinced that defendant understood his constitutional rights" defendant was permitted to make his statement. Defendant, in his own words, told the officers "who made the bombs and how they started the fires; who took part." He "related all these things in narrative form." Thereafter defendant's answers to questions propounded by Detective Captain Jim Auten were recorded on tape.

After Captain Auten had completed his testimony on *voir dire* defendant's counsel requested permission to examine Detective Hovis before the court ruled on the admissibility of the confession. Hovis then testified in corroboration of Captain Auten. Defendant introduced the warrant issued 19 September 1969, which charged defendant with burning the Welch barn, and offered no other evidence. Thereupon Judge Falls made the following ruling:

"Based upon the foregoing testimony elicited from this witness, the court finds as a fact that this defendant knowingly, understandingly, and voluntarily made whatever statements the tape indicates. Now, I haven't heard the tape yet and don't know what it says, but at this juncture, the only thing I can rule on is whether or not he understood and voluntarily submitted to this interrogation on tape. I'm holding now that he did understand and voluntarily submitted to this tape, whatever it shows. It may exonerate him, for all I know. Let the jury come back, Mr. Sheriff."

The jury returned and Captain Auten testified that defendant after having been fully warned of his constitutional

rights, made the following statement in the presence of Officers Hovis, Holmsley, and Brandon: On the 10th of August defendant, Thadus Benton, Larry Benton, and Harry Hall were in Stanley at the home of Thadus. Thadus made a bomb by pouring gasoline into a quart Coco-Cola bottle and putting a piece of gauze shirt in the bottle neck. The four then went in Hall's automobile to the vicinity of the Welch residence, where defendant and Larry Benton got out of the car. Thadus handed the gas bomb to Larry, and defendant and Larry went across a field to the Welch home. After igniting the gauze Larry threw the bottle against the house and ran. As they fled "the bomb fired up," and they heard Mrs. Welch scream.

After hearing defendant's statement, Auten questioned him in great detail and made a tape of their conversation on a Tandburg Recorder. With reference to this tape Auten testified: At the time of the trial the tape was just as it was when the interrogation was completed; nothing had been erased or deleted from it. He recorded the entire conversation and the voices on the tape were his and defendant's. The tape had been in his possession, locked up in his office since 20 September 1969. On cross-examination Auten said he did not recall whether the recorder was cut off at any time during the conversation.

The State then offered the tape in evidence. Defendant's objection, made on the grounds that the recorded conversation was in violation of his constitutional rights and that the proper foundation had not been laid "for the playing of the tape," was overruled. The tape was then "played" in the presence of the jury.

At the beginning of the taped conversation Auten advised defendant of his constitutional rights in minute detail, and defendant said he understood each one of them. He also said that since his arrest no threats or promises had been made to him by any person; that he had not been questioned by any officer prior to the time he told the jailer he wanted to talk to a detective; that he was making the statement because he wanted to tell the truth "about these burnings in Stanley." Defendant said he was then sixteen years old. Thereafter, in response to Auten's questions, defendant repeated the statement about which Auten had testified.

State v. Lynch

In the taped conversation defendant was next asked if he knew who had burned Mr. Welch's barn. He said that he was present when the plans to burn the barn were made but not when it was burned; that Thadus made the gas bombs, and about midnight on 27 June 1969 Thadus, June Lynch, Tommy Wingate, and Larry had burned the Welch barn and Mamie Brown's unoccupied house. Thadus and Terry Barnwell set fire to the Brown house "to draw the police up there so Larry would have time enough to get Mr. Welch's barn." Larry and Thadus had also burned a two-story house belonging to Mrs. Summerow. Defendant had been with them three days earlier when their first attempt to burn the Summerow house had failed. The group had decided to burn the Welch barn and residence to revenge the death of Billy Gene McDowell, "the boy that Mr. Welch ran over." Thadus, the leader, had given defendant a black patch to put on his coat and said, "We belong to the Black Panthers." He also told defendant that "they could walk up and down the street with their coats on, being cool and all that, and have people scared of them and saying they belonged to the Black Panthers."

At the close of the taped conversation defendant conceded that, in 1968, he had given the officers information about the burning of another barn but had later changed his story. In explanation he said he was then only fifteen, and Thadus had threatened to kill him. However, he said he was no longer afraid and had no intention of changing the story he had just retold on the tape—"not ever."

After the jury had heard the tape, defendant moved "to strike everything contained on that tape." The court's ruling was: "Motion allowed as it pertains to parts or responses not contained in this indictment. Motion denied as to the tape concerning the dwelling house of Mr. and Mrs. Welch." Defendant then moved "to strike any testimony about the Black Panthers and all that sort of thing." This motion was also denied.

Detective Hovis testified that, in consequence of the information which defendant gave the officers on 21 September 1969, he was taken to Thadus Benton's home. There defendant showed them the spot in a nearby field where Thadus had made the bombs. Under some wood they found, *inter alia,* matches in a sack and a funnel.

At the conclusion of the State's evidence defendant's motion for nonsuit was overruled. Defendant then offered evidence which consisted of his own testimony and that of his mother.

Defendant's testimony, except when quoted, is summarized below:

At the time of the trial defendant was seventeen years old and had completed the tenth grade in school. When he was arrested Mr. Hovis asked him if he wanted to make any phone calls and if he wanted to make a statement. To both inquiries he answered no, and that was all Hovis asked him. The next day he was taken to the sheriff's office. At that time he asked permission to call his mother. Mr. Auten reported that defendant wasn't going to call his mother "unless he told him something." When defendant said he knew nothing to tell, Auten threatened to take him back to jail, where he would rot and never see his mother again. Defendant "wanted to see his mother real bad and Auten read something off a piece of paper and rehearsed it three times and put it on tape." He said: "They promised to let me make a phone call if I would concoct a story about this thing, and that's what I want the jury to believe. I didn't know anything about these burnings but just told the officers anything out of my imagination. I don't know whether it fit what had happened or not. . . . I want the jury to believe that the Captain of the Rural Police Detective Division read off a story and rehearsed it with me and had me repeat it on the tape. It is my voice on the tape. . . . I was scared when I was making the tape." Defendant denied that he requested the jailer to take him to the detective's office and that he told the officers he "wanted to make a clean breast of this thing and wanted to tell the truth."

The day after the tape was made defendant went to Stanley with Detectives Brandon, Hovis, and Holmsley. Defendant does not know where he was on August 10th. He knows the names of Larry and Thadus Benton, but he has "done nothing with them in reference to any burning." He does not remember what he said in Mr. Auten's office immediately prior to making the tape with reference to any occurrences in Stanley. He "was feeling scared—sorta scared when he was in his office." He did recall, however, that it was in Thadus' trashpile, not in the field behind Thadus' house, that the officers found the

matches and "other materials for making Molotov cocktails." He knows nothing about the Black Panther organization.

On cross-examination the solicitor asked defendant if, at the end of the taped conversation, Mr. Auten inquired of him if anybody had coerced or threatened him. To this question counsel for defendant objected. When the court made no ruling or comment whatever defendant answered, "I don't know." The court then said to the reporter: "Put an overruled every time he says objection." Prior thereto Judge Falls had ignored four other objections by defendant's counsel. Thereafter, the solicitor asked defendant 59 questions with reference to his taped statement. To 34 of the questions defendant's counsel interposed objections, each of which the court ignored. The transcript shows: "Objection by defendant. No ruling by the court." Then appears defendant's answer to the question.

Defendant's mother testified that he was at home from 5:00 p.m. Sunday, 10 August 1969, until the following morning when he went to work with her. Upon cross-examination the solicitor asked Mrs. Lynch three questions to which defendant's counsel objected. The court also ignored each of these objections and the witness answered the questions.

At the conclusion of defendant's evidence, in rebuttal, the State offered the testimony of Cora Lee Crawford. She testified that during August 1969 she had seen defendant in the company of Thadus and Larry Benton in Stanley, "walking on the streets together like a bunch of boys usually do if they are together." Judge Falls ignored defendant's objection to this testimony just as he had ignored previous objections. Mrs. Crawford also testified that between 9:30 and 10:00 p.m. on the night Mr. Welch's house was burned Larry Benton came into the Bossa Nova 300 Club, which she operated, and asked her for water with which to wash his hands. She observed that "he had dirt on his hands and the perfume of gas."

The jury found defendant guilty of the offense charged. From a sentence of ten years' imprisonment in the State's Prison defendant appealed to the Court of Appeals, which found no error in the trial. Without discussion, two members of the hearing panel overruled all of defendant's assignments of error as having no merit. The third member registered his dissent, and defendant appealed to this Court as a matter of right.

State v. Lynch

*Attorney General Morgan; Deputy Attorney General White; Staff Attorney Satisky for the State.*

*Robert C. Powell for defendant appellant.*

SHARP, Justice.

[1]  Defendant brings forward seven assignments of error, three of which require consideration. We first examine the assignment which presents the question whether the judge prejudiced defendant's trial by failing to rule upon 38 objections made by defense counsel after having instructed the court reporter to "put an overruled after every time he says objection."

[2]  Every person charged with crime has the right to the assistance of counsel at a trial "before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm." *State v. Carter,* 233 N.C. 581, 583, 65 S.E. 2d 9, 10. In every trial the judge and the defendant's counsel share the twofold responsibility of enforcing a defendant's right to a fair trial and of keeping the trial moving at a reasonable speed. The judge, however, is in charge of proceedings.

[3]  In this day of congested criminal dockets and overcrowded calendars, a lawyer's objections and exceptions frequently harass the judge. However it is a lawyer's duty to represent his client. *State v. Mansell,* 192 N.C. 20, 133 S.E. 190. In doing so he is required "to present everything admissible that favors his client and to scrutinize by cross-examination everything unfavorable. The inevitable result is that the lawyer usually feels that he is unfairly prodded by the judge, while the judge feels the lawyer obstinately drags his feet." Annot., 62 A.L.R. 2d 166, 237 (1958). This conflict tests the mettle of both as officers of the court. The trial judge, who occupies "an exalted position," must abstain from conduct or language which tends to discredit the defendant or his cause in the eyes of the jury. *State v. Carter, supra; Withers v. Lane,* 144 N.C. 184, 56 S.E. 855. An attorney must, upon all occasions, manifest "a marked respect for the court in which he practices, and for the judge thereof. . . . In return, he is entitled to similar treatment from the trial judge, and most certainly to the extent that the interest of his clients will not be prejudiced." *Dennison v. State,* 17 Ala. App. 674, 676, 88 So. 211, 213.

---

---

[4]   Under our law a judge is forbidden to express an opinion upon the credibility of the evidence. "Regardless of how unreasonable or improbable the defendant's story, the court must maintain the 'cold neutrality of an impartial judge.' " *State v. Taylor,* 243 N.C. 688, 91 S.E. 2d 924, 925. In his manner of ruling upon objections, "the judge must exercise the same caution as at other stages of the trial not to express an opinion as to the credibility of the witness or the merits of the case." Stansbury, N. C. Evidence § 28 (2d ed. 1963). If, at any time, during the trial, the judge "uses language which tends to bring an attorney into contempt before the jury . . . he commits an error of law, which would, of necessity, effect a reversal of the judgment and a remandment of the cause." *Dennison v. State, supra* at 676, 88 So. at 213. In *Dennison,* a new trial was awarded for the failure of the court to allow defense counsel to make the objections and motions he deemed the interest of his client to require.

In *State v. Phillips,* 59 Wash. 252, 109 P. 1047, following a heated colloquy, the judge told defendant's counsel to take an exception every time the court spoke and every time he batted his eye. In awarding a new trial because of this "challenge," the court said:

" . . . The aid of counsel is guaranteed by the Constitution to every person accused of crime, and this is universally recognized as one of the surest safeguards against injustice and oppression. Any conduct or statement on the part of the court that tends to impair the influence or destroy the usefulness of counsel is palpable and manifest error." *Id.* at 259, 109 P. at 1050.

In *State v. Lee,* 166 N.C. 250, 80 S.E. 977, after defense counsel had argued from the testimony of the prosecuting witness that the prosecution was motivated by jealousy, the trial judge told the jury there was no evidence of this; that counsel was not sworn; and they should "pay no attention to anything that he has said about this." This Court granted a new trial, saying:

" . . . The relation between courts and counsel should always be courteous. Should counsel forget their duty in this respect, the presiding judge has authority to enforce respect by proceedings in contempt. Judges should therefore be careful

to observe the respect which is due from them to counsel, for when this is not done there is not only no remedy except by appeal to this Court, but the cause which the counsel is advocating may be seriously damaged in the estimation of the jury, as was very probably the case in this instance." *Id.* at 255, 80 S.E. at 978.

[1]    The record discloses very little, if any, merit in the objections which the court ignored, but it also discloses that defense counsel at all times accorded the presiding judge the high degree of courtesy and respect to which the court is entitled. Judge Falls' blanket instruction to the court reporter to overrule *any* objection which defendant's counsel might make necessarily belittled both defendant's cause and his attorney in the eyes of the jury. The clear implication was that there could be no merit in any objection defendant's counsel might make or that defendant was so obviously guilty his objections were a waste of the court's time. Because the court's language and conduct tended to prejudice defendant's cause with the jury there must be a new trial.

Since there must be a new trial, we deem it necessary to discuss the two assignments of error relating to defendant's confession and the taped recording of the interrogation which followed it. Defendant contends that both were improperly admitted in evidence because (1) he was an indigent minor, without counsel at the time it was made; (2) he did not voluntarily and understandingly waive his right to counsel; (3) he did not waive counsel in writing as required by G.S. 7A-450; (4) the trial judge made no findings on *voir dire* that he had waived counsel; and (5) the evidence before the court would not support a finding that he waived counsel in the manner provided by statute. With reference to the recording defendant makes additional contentions which will be noted later.

[5, 6]    In this jurisdiction a confession is not inadmissible merely because the person making it is a minor. A minor who has arrived at the age of accountability for crime may waive counsel in the manner provided by law and make a voluntary confession without the presence of either counsel or an adult member of his family provided he fully understands his constitutional rights and the meaning and consequences of his statement. *State v. Murry,* 277 N.C. 197, 176 S.E. 2d 738; *State v. Hill,* 276 N.C. 1, 170 S.E. 2d 885.

State v. Lynch

[7]   In determining whether a minor's in-custody confession was voluntarily and understandingly made the judge will consider not only his age but his intelligence, education, experience, the fact that he was in custody, and any other factor bearing upon the question. In other words, "the 'totality of circumstances' rule for the admission of out-of-court confessions applies to the confessions of minors as well as adults." *State v. Dawson,* 278 N.C. 351, 180 S.E. 2d 140. In *State v. Thorpe,* 274 N.C. 457, 164 S.E. 2d 171, we held the in-custody confession of a minor who was without counsel to have been improperly admitted in evidence; in *State v. Murry, supra,* and *State v. Hill, supra,* the confessions of minors made in the absence of counsel were held admissible.

The rule is that one may waive counsel if he does so freely and voluntarily and with full understanding that he has the right to be represented by an attorney. *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S.Ct. 1602; *State v. Williams,* 274 N.C. 328, 163 S.E. 2d 353. Prior to the enactment of G.S. 7A-450 *et seq.,* effective 1 July 1969, there was no difference in the requirements for a waiver of counsel by indigents and nonindigents. Each could waive the right either orally or in writing. *State v. Williams, supra; State v. McNeil,* 263 N.C. 260, 139 S.E. 2d 667. This remains the rule in the federal courts. *Miranda v. Arizona, supra; United States v. Hayes,* 385 F. 2d 375 (4th Cir. 1967) ; *Klingler v. United States,* 409 F. 2d 299 (8th Cir. 1969) ; *Bond v. United States,* 397 F. 2d 162 (10th Cir. 1968).

[8]   Article 36 of N. C. Gen. Stats. ch. 7A, *which is applicable to indigents only,* provides, *inter alia,* that an indigent charged with a felony or a misdemeanor for which the punishment exceeds six months' imprisonment or a fine of $500.00 is entitled to an attorney as soon as feasible after his arrest. Such entitlement continues through any critical stage of the proceeding, including an in-custody interrogation. G.S. 7A-451. An indigent person is defined as one "financially unable to secure legal representation and to provide all other necessary expenses of representation" in defending the criminal action against him. G.S. 7A-450(a).

An indigent who has been informed of his right to counsel under Article 36 may, *in writing,* waive this right, "if the court

finds of record that at the time of the waiver the indigent person acted with full awareness of his rights and of the consequence of a waiver." G.S. 7A-457. In imposing the requirement that an *indigent's* waiver of counsel must be in writing, the North Carolina General Assembly imposed a more stringent requirement than the federal courts have done.

Under Article 36 it is the duty of the authority having charge of a person who is without counsel for more than forty-eight hours after being taken into custody to so inform the clerk of the superior court. The clerk, after making a preliminary determination of the person's entitlement to counsel, shall so inform any district or superior court judge holding court in the county. The judge so informed may assign counsel. G.S. 7A-453(b). If a defendant upon being taken into custody, states that he is indigent and desires counsel, the authority having custody shall immediately inform the clerk who shall immediately inform the judge. G.S. 7A-453(c).

At the hearing which Judge Falls conducted for the purpose of determining the competency of defendant's in-custody statements, only Detectives Auten and Hovis testified to the circumstances under which they were made. Defendant himself did not testify. There was no conflict in the testimony of the two officers. It tended to show that defendant, after having been brought to the sheriff's office at his request, said he "wanted to tell the truth about the thing, what he knew about it, and what part each one of them had in it"; that prior thereto no officer had interrogated him; that he was not permitted to talk until after he had been clearly and repeatedly warned of his constitutional rights as required by the *Miranda* decision; that after being fully apprised of his right to have counsel present when he made a statement, and after being told that the State would provide him with a lawyer if he was unable to employ one, defendant said he did not want counsel; and that he then gave an account of the burning of the Welch residence which implicated him in the crime.

[9] At the conclusion of the *voir dire* Judge Falls, without making any findings of fact as to the voluntariness of defendant's confession, permitted Captain Auten to testify to the narrative summarized above, which the officer said he volunteered. If, on *voir dire*, there is conflicting testimony bearing on the admissibility of a confession, it is error for the judge to

State v. Lynch

admit it upon a mere statement of his conclusion that the confession was freely and voluntarily made. In such a situation the judge must make specific findings so that the appellate court can determine whether the facts found will support his conclusions. *State v. Moore,* 275 N.C. 141, 166 S.E. 2d 53; *State v. Barber,* 268 N.C. 509, 151 S.E. 2d 51; *State v. Conyers,* 267 N.C. 618, 148 S.E. 2d 569; *State v. Barnes,* 264 N.C. 517, 142 S.E. 2d 344. When, as in this case, no conflicting testimony is offered on *voir dire,* it is not error for the judge to admit the confession without making specific findings. *State v. Bishop,* 272 N.C. 283, 158 S.E. 2d 511; *State v. Keith,* 266 N.C. 263, 145 S.E. 2d 841. Clearly, however, it is always the better practice for the court to find the facts upon which it concludes any confession is admissible.

[10] Accepting the credibility of the uncontradicted testimony adduced on *voir dire,* as Judge Falls obviously did since he admitted the evidence, defendant's *narrative statement* was not the result of an in-custody interrogation. Thus, even though his indigency be assumed, the presence of counsel was not required at that time. As the Supreme Court said in *Miranda v. Arizona, supra:* "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without benefit of warnings and counsel, *but whether he can be interrogated.* There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding to-day." *Id.* at 478, 16 L. Ed. 2d at 726 (Emphasis added).

On this record, we hold that the admission of defendant's narrative confession was not error. The question and answer period which followed that narration, however, was an in-custody interrogation at which defendant gave incriminating information not included in his previous statement. The admissibility of the sound recording of defendant's interrogation, therefore, involves additional considerations not pertinent to the volunteered confession. The first is whether defendant was an indigent at the time of the interrogation. As to this, Judge Falls made no finding. Indeed, the only "finding" which the *voir dire* produced was his *conclusion* "that this defendant

knowingly, understandingly, and voluntarily made whatever statement the tape indicates."

[11] At his preliminary hearing on 16 October 1969 defendant was represented by privately employed counsel. It was not until 24 November 1969 that defendant executed an affidavit of indigency and counsel was appointed to represent him at his trial. Upon the *voir dire* neither court nor counsel made any inquiry whether defendant was indigent on 20 September 1969, the day of the interrogation. If he was indigent, he was entitled to the services of counsel at the interrogation and, under G.S. 7A-457, he could waive that right only in writing. The evidence on *voir dire* was plenary and uncontradicted that, after his right to counsel had been fully explained to him, defendant said he did not want a lawyer. However, there is no evidence in the record that defendant signed a written waiver of counsel and no evidence bearing upon whether he was an indigent on 20 September 1969. Upon the retrial the question of defendant's indigency must be inquired into on *voir dire* and findings made *of record* as provided by G.S. 7A-457. If, at the time of his in-custody interrogation, defendant was indigent and had not signed a written waiver of counsel, Article 36 renders the statements made on interrogation inadmissible; and this is true whether the evidence offered to prove them be the testimony of a witness who was present or a sound recording of the interrogation itself.

Defendant's other contentions are that the recording of his interrogation was erroneously admitted over his objection because (1) the judge did not conduct a *voir dire* to ascertain whether it met the requirements of admissibility and whether it contained incompetent testimony; and (2) he did not instruct the jury that they should consider it only as it tended to corroborate the testimony of the detectives.

If a defendant's statement is inadmissible because impermissibly obtained, *a fortiorari*, a recording of it is equally inadmissible in evidence. However, "it is now almost universally held that sound recordings, if relating to otherwise competent evidence, are admissible providing a proper foundation is laid for their admission." Annot., Sound Recordings in Evidence, 58 A.L.R. 2d 1024, 1027 (1958); 29 Am. Jur. 2d *Evidence* § 534 (1967). Such recordings were received in evidence in *State v. Godwin*, 267 N.C. 216, 147 S.E. 2d 890; *State v. Walker*,

State v. Lynch

251 N.C. 465, 482-3, 112 S.E. 2d 61, 74-75. *See State v. Fox,* 227 N.C. 1, 175 S.E. 2d 561.

[12] A taped recording of an accused's statement is only one method of perpetuating it. When properly authenticated, a recorded confession—if voluntary and otherwise lawful—"is admissible the same as if it had been in (defendant's) own handwriting, transcribed by a reporter who had taken notes, or testimony of one who heard the statements." *Thomas v. Davis,* 249 F. 2d 232, 235 (10th Cir. 1957). In other words a recorded confession, like any other form of confession, is substantive evidence. Indeed "it has been said that a sound recording of a confession is of more value to the court than one in writing, especially where an issue has been raised as to whether it was voluntary." 29 Am. Jur. 2d *Evidence* § 534 (1967); 58 A.L.R. 2d 1024, § 13.

To lay a proper foundation for the admission of a defendant's recorded confession or incriminating statement, courts are in general agreement that the State must show to the trial court's satisfaction (1) that the recorded testimony was legally obtained and otherwise competent; (2) that the mechanical device was capable of recording testimony and that it was operating properly at the time the statement was recorded; (3) that the operator was competent and operated the machine properly; (4) the identity of the recorded voices; (5) the accuracy and authenticity of the recording; (6) that defendant's entire statement was recorded and no changes, additions, or deletions have since been made; and (7) the custody and manner in which the recording has been preserved since it was made. Annot., 58 A.L.R. 2d 1024, §§ 4 and 8 and cases therein cited; 29 Am. Jur. 2d *Evidence* § 436 (1967).

[13] Upon an objection to the introduction of a recorded statement, in order to ascertain if it meets the foregoing requirements, the trial judge must necessarily conduct a *voir dire* and listen to the recording in the absence of the jury. "In this way he can decide whether it is sufficiently audible, intelligible, not obviously fragmented, and, also of considerable importance, whether it contains any improper and prejudicial matter which ought to be deleted." *State v. Driver,* 38 N.J. 255, 288, 183 A. 2d 655, 672. This procedure affords counsel the opportunity to object to any portions of the recording which he deems incompetent and permits incompetent matter to be kept from the

jury in some appropriate manner. In *State v. Strickland,* 276 N.C. 253, 173 S.E. 2d 129, we prescribed analogous procedure for the preview of sound moving pictures taken of a defendant, who had been arrested for operating an automobile upon the public highway while under the influence of an intoxicant. *Accord, Sanders v. State,* 237 Miss. 772, 115 So. 2d 145; *Wright v. State,* 38 Ala. App. 64, 79 So. 2d 66; 58 A.L.R. 2d 1024, §§ 4 and 8.

[14, 15] If, on the next trial, the State offers defendant's recorded statement in evidence, and defendant objects to its introduction, the judge must conduct a *voir dire* to determine (1) whether defendant's interrogation without counsel was proper; (2) if so, whether the recording meets the tests for admissibility specified herein. If he holds the recording to be admissible, in the absence of the jury, he must also hear and pass upon any objections which defendant desires to make to *specific* statements contained in it. On this record, defendant's motion to strike the references to the Black Panther organization should have been allowed. This prejudicial testimony was irrelevant to the issue of defendant's guilt of the crime charged. Although not the subject of a specific objection the testimony as to information which defendant gave the officers in 1968 with reference to burnings during that year was likewise incompetent and prejudicial.

New trial.

Justice LAKE concurs in result.